**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

LOREN SAMUEL WILLIAMSON,
            *Defendant-Appellant.*

No. 05-30150

D.C. No.
CR-02-60017-AI

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
January 12, 2006—Portland, Oregon

Filed March 13, 2006

Before: Diarmuid F. O'Scannlain, Andrew J. Kleinfeld, and
Susan P. Graber, Circuit Judges.

Opinion by Judge O'Scannlain

## COUNSEL

Larry A. Roloff, Eugene Oregon, argued the cause and was on the briefs for the appellant.

Jeffrey J. Kent, Assistant United States Attorney, Eugene, Oregon, argued the cause for the appellee. Karin J. Immergut, United States Attorney, was on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We consider whether federal agents and local police legally seized a home computer and related equipment used in the international transmission of child pornography.

I

In June, 2000, police in the European country of Croatia discovered 19 child pornographic photographs that had been posted to an internet site and, using publicly available information, traced the source of the pictures to a computer in Roseburg, Oregon, and thereafter notified the Federal Bureau of Investigation ("FBI"). Further investigation led FBI agents to suspect that the pictures originated from a computer used at the home of Loren Williamson.

A

FBI Agent Victor Nielsen, investigating the tip, submitted an Affidavit in support of a search warrant, which claimed probable cause to believe "evidence of violations of [18 U.S.C. §] 2252" could be found at Williamson's residence. Agent Nielsen averred that he had reviewed the 19 images and that they depicted " 'minors' engaged in 'sexually explicit conduct' as defined in [18 U.S.C. §] 2256, and within the meaning of [18 U.S.C. §] 2252." The cited provisions are part of the Child Pornography Prevention Act of 1996, 18 U.S.C. § 2251 *et seq.*

The search warrant sought permission to seize a wide range of property. Paragraph (a) on the warrant's Attachment B listed the items to be seized, including computers and related hardware and software "which may be or are used to visually depict child pornography, child erotica, information pertaining to the sexual interest in child pornography, sexual activity with children or the distribution, possession or receipt of child pornography, child erotica or information pertaining to an interest in child pornography or child erotica." Paragraph (b) permits seizure of "correspondence pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in [18 U.S.C. §] 2256 attached hereto at Attachment B1." Paragraph (c) plainly states that "[t]he term minors as used in this list of items to be seized means persons under the age of 18 years." Similarly, paragraphs (d) through (l) authorize the seizure of books and magazines, motion pictures, pictures and negatives, correspondence, receipts relating to shipment, address books, diaries, notebooks, and other materials related to the "visual depiction of minors engaged in sexually explicit conduct, as defined in [18 U.S.C. § 2256]."

With respect to the original 19 images, the Affidavit concluded:

Your affiant's review of the above referenced image files revealed that all 19 photographs contain images depicting "minors" engaged in "sexually explicit conduct" as defined in [18 U.S.C. § 2256], and withing [sic] the meaning of [18 U.S.C. § 2252]. Specifically, these images depict unclothed "minors" in various states of sexual arousal and many of them depict "minors" engaged in sexual acts as defined by [18 U.S.C. § 2256]. Your affiant and other trained agents have examined these images and concluded that a majority of them depict individuals under the age of 18 years engaging in actual or simulated sexual acts . . . .

The statute defines a "minor" as "any person under the age of eighteen years." 18 U.S.C. § 2256(1). In 2001, the statute defined "child pornography" to mean

any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct where—

(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

(B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;

(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or

(D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or

contains a visual depiction of a minor engaging in sexually explicit conduct[.]

18 U.S.C. § 2256(8) (2001). At the time the warrant was drawn, we had already decided that subsections (B) and (D) were unconstitutionally overbroad. *Free Speech Coalition v. Reno*, 198 F.3d 1083 (9th Cir. 1999), *aff'd Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).

B

On July 5, 2001, FBI agents executed the search warrant. At the outset of the search, the agents displayed the search warrant and their official credentials to Williamson, then age 50, and his mother, who lived in different buildings on the same property. Law enforcement officers present included four FBI agents—with Agent Nielsen directing the search—and two local police officers. After arriving at the main house, Agent Nielsen showed Williamson's mother the face page of the warrant. Agent Nielsen then accompanied her to her son's residence behind the main house and retrieved him while the FBI agents secured several weapons lying in plain sight.

Agent Nielsen then sat with Williamson and his mother on the living room couch in the main house and explained that the agents sought child pornography in Williamson's possession. Agent Nielsen testified that he "explained to Mrs. Williamson and Loren [Williamson] that we were there to search for child pornography and various things that go along with child pornography." Agent Nielsen also inquired as to where Williamson's possessions were, so that the agents could limit the scope of their search and avoid searching Williamson's parents' property. Agent Nielsen had a copy of the search warrant on his lap during this conversation, but did not provide a copy to either Williamson or his mother, and neither requested one.

After Agent Nielsen explained the purpose of the search, two FBI agents began searching Williamson's room. While

the two agents searched, Agent Nielsen remained with Williamson and his mother, conversing with them. At some point near the conclusion of the four-hour search, Williamson's father came home. Williamson's father was angry and uncooperative. While the police attempted to explain the contents of the warrant and the purpose of their search to Williamson's father, he refused to calm down. As the search neared completion, Williamson's father requested a copy of the search warrant. An agent responded that "we're about to give it to you, along with a receipt which we're now preparing of the items that we're taking, and that we will leave that in your custody."

Before leaving, the agents provided Williamson with a copy of the search warrant (with attachments) and a receipt for the items taken. The police also offered to allow Williamson and his parents to inspect the items seized and compare them to those listed on the receipt, but they declined to do so.

During the search, agents seized copies of the 19 photographs allegedly transmitted to Croatia, as well as computer equipment, a digital camera, digital editing software, hard drives, CD-ROMs, Zip disks, and a variety of pornographic photographs. The FBI agents discovered thousands of additional child pornographic pictures on the seized digital media.

Williamson stipulated that the government could establish that the 19 photographs were of "actual"[1] minors engaged in sexually explicit conduct. Further, Williamson stipulated that FBI agents recovered "thousands of visual depictions of child pornography as defined above ['visual depictions of actual minors under 18 years of age engaged in sexually explicit conduct,'] and in [18 U.S.C. § 2256.]"

---

[1]Relevant to this case, there are two types of child pornography. Roughly speaking, "actual" child pornography depicts true minors engaged in sexual conduct. In contrast, "virtual" child pornography depicts those who appear to be minors, but are not. Virtual child pornography is constitutionally protected, but actual child pornography is not. *See Ashcroft v. Free Speech Coalition*, 535 U.S. at 234.

C

Agent Nielsen testified that when he executed the search warrant, he was unaware of our case law requiring him to provide a copy of the search warrant at the outset of the search. The government concedes failure to do so was error. As Agent Nielsen explained:

> We always provide a copy of the search warrant and receipt when we exit a residence. We always show them a copy as we go in . . . .
>
> In my mind-set, I was definitely going to leave them a copy of the warrant at the end. And it was not —it was not necessary to give them the warrant until we were finished.

The district court denied the motion to suppress concluding:

> Agent Nielsen testified that it was standard protocol to leave a copy of the search warrant at the conclusion of the search, and that is what the agents had intended to do. . . .
>
> I accept the testimony of Agent Nielsen. . . . I further find that Nielsen's actions evince no deliberate disregard of [Federal Rule of Criminal Procedure] 41(d).

The district court noted that under *United States v. Gantt*, 194 F.3d 987, 1001 (9th Cir. 1999), the purpose for requiring law enforcement officers to turn over a copy of the warrant is "to give notice" of what they are entitled to seize and to provide assurance of their lawful authority. Given the nature of the search, the district court concluded that "an order of suppression would elevate form over substance and would not further the underlying purpose of Rule 41(d)."

## D

On June 17, 2003, the district court convicted Williamson through a stipulated facts trial. On March 8, 2005, the district court sentenced Williamson to 180 months in prison, the statutory maximum.[2] The district court derived the final Guideline sentence as follows:

| | |
|---|---|
| § 2G2.2 Base offense level: | 17 |
| § 2G2.2(b)(5) (use of computer) | +2 |
| § 2G2.2(b)(1) (minor under 12) | +2 |
| § 2G2.2(b)(4) (pattern of sexual abuse) | +5 |
| § 2G2.2 App. Note 2 (seriousness of abuse) | +4 |
| § 5K2.0 (aggravating circumstances) | +4 |
| TOTAL OFFENSE LEVEL: | 34 |

An offense level of 34 yields a sentencing range of 151 to 188 months.

At the sentencing hearing, Williamson's son and daughter-in-law—the parents of his granddaughter—as well as his ex-wife's sister, testified about Williamson's history of sexually abusing others. Additionally, a forensic analyst with the Eugene, Oregon, police force testified regarding the content of various photographs seized from Williamson's residence. Among other things, the evidence showed that Williamson had sexually molested and photographed his granddaughter while she was four to five years old and in his care.

---

[2]Shortly after Williamson's sentencing hearing, but before he was sentenced, the Supreme Court handed down *Blakely v. Washington*, 542 U.S. 296 (2004). By the time a *Blakely*-compliant PSR was prepared, the Supreme Court had heard oral argument in *United States v. Booker*, 543 U.S. 220 (2005). The district court deferred sentencing pending *Booker*. Shortly after *Booker* was released, the district court sentenced Williamson, treating the Sentencing Guidelines as advisory.

While sentencing Williamson, the district court expressed the view that 180 months, in addition to being the statutory maximum, was also the "only reasonable sentence that is reasonable under these facts."

Williamson timely appeals both his conviction and sentence.

## II

Williamson first argues that the manner in which the agents executed the search warrant violated Rule 41(d) and that evidence from the search should have been suppressed.[3]

## A

At the time of the search, Rule 41(d) read:

> The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken.

Fed. R. Crim. P. 41(d) (2001) (now 41(f)(3)).

We construed Rule 41(d) in *Gantt*, 194 F.3d at 996, in which we recounted how the police had callously executed a search warrant:

> Upon entering Gantt's residence, the agents did

---

[3]The district court's denial of a motion to exclude evidence is reviewed *de novo*. *United States v. Bautista*, 362 F.3d 584, 588-89 (9th Cir. 2004). The district court's factual findings are reviewed for clear error. *United States v. Martinez-Garcia*, 397 F.3d 1205, 1211 n.1 (9th Cir.) *cert. denied*, 126 S. Ct. 241 (2005).

not present her with a copy of the warrant. Instead, they directed her to sit in the hallway while they conducted a three-hour search. The agents did not show Gantt the warrant under the authority of which they had invaded her privacy until Gantt herself asked to see the search warrant. The agents responded by showing her the face of the warrant but not Attachment A [which listed items to be seized]. . . . After concluding their search, the agents gave Gantt an inventory of items seized and left a copy of the warrant with Attachment A behind in the hotel room. Before Gantt could examine the copy of the warrant left in the hotel room, however, the agents arrested her and took her to an FBI office. Only at the FBI office was Gantt shown the entire warrant . . . .

[1] We reasoned that "[t]he Supreme Court has repeatedly held that an essential function of the warrant is to 'assure[ ] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.' " *Id.* at 1001 (brackets in original) (quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977), *abrogated on other grounds*, *California v. Acevedo*, 500 U.S. 565 (1991)). Further, the warrant "give[s] notice to the person subject to the search what the officers are entitled to seize." *Id.* (internal quotation marks omitted). Based on notice and assurance concerns, we held that, "[a]bsent exigent circumstances, Rule 41(d) requires service of the warrant at the outset of the search on persons present at the search of their premises." *Id.* at 1000; *see also United States v. Smith*, 424 F.3d 992, 1006-07 (9th Cir. 2005).[4]

---

[4]The government contends, with some force, that several post-*Gantt* cases cast doubt on *Gantt*'s status as good law. First, in *Groh v. Ramirez*, 540 U.S. 551, 562 n.5 (2004), the Supreme Court stated that "neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search." However, in *United States v. Mann*, 389

**[2]** The district court concluded that there was no Rule 41(d) violation because the officers explained the search to Williamson and took other steps to mitigate and to limit their intrusion. In light of *Gantt*, such a legal conclusion was erroneous. While the officers may have narrowly and reasonably executed the search warrant, such efforts would not trump *Gantt*. We must conclude, therefore, that under our current jurisprudence the search violated Rule 41(d) because the agents did not provide a copy of the warrant at the outset of the search.

B

**[3]** Because the search violated Rule 41(d), Williamson then asks us to suppress the seized evidence although we have repeatedly held—and have been instructed by the Supreme Court—that suppression is rarely the proper remedy for a Rule 41 violation. The Supreme Court has stated that the Federal Rules of Criminal Procedure do "not constitute a statutory expansion of the exclusionary rule." *United States v. Calandra*, 414 U.S. 338, 348 n.6 (1974); *see also, e.g., United States v. Johnson*, 660 F.2d 749, 753 (9th Cir. 1981) (noting that "[o]nly a 'fundamental' violation of Rule 41 requires automatic suppression, and a violation is 'fundamental' only where it, in effect, renders the search *unconstitutional under traditional fourth amendment standards*" (emphasis added) (internal quotation marks omitted)). Even *Gantt*, upon which Williamson relies, enunciated the same familiar principle: "Violations of Rule 41(d) do not usually demand suppression

F.3d 869, 875 n.1 (9th Cir. 2004), we stated that, while "[dictum] in . . . *Groh v. Ramirez* casts serious doubt both on our interpretation of Rule 41 and our reasoning in *Gantt*, it fails definitively to abrogate our holding." *See also Smith*, 424 F.3d at 1007 (assuming that *Gantt* applies and distinguishing it). We likewise must conclude that *Martinez-Garcia*, 397 F.3d at 1208-10, which did not even reach the Rule 41 question, did not overrule *Gantt*. Thus, we will assume that *Gantt* remains good law in this Circuit.

. . . ." 194 F.3d at 1005; *see also United States v. Hornick*, 815 F.2d 1156, 1158 (7th Cir. 1987) ("[I]t is difficult to anticipate any violation of Rule 41, short of a defect that also offends the Warrant Clause of the fourth amendment, that would call for suppression.").

There are three circumstances under which evidence obtained in violation of Federal Rule of Criminal Procedure 41 requires suppression:

> 1) the violation rises to a "constitutional magnitude;" 2) the defendant was prejudiced, in the sense that the search would not have occurred or would not have been so abrasive if law enforcement had followed the Rule; or 3) officers acted in "intentional and deliberate disregard" of a provision in the Rule.

*United States v. Martinez-Garcia*, 397 F.3d 1205, 1213 (9th Cir.) *cert. denied*, 126 S. Ct. 241 (2005).

1

**[4]** Williamson does not contend that the violation rises to a "constitutional magnitude." The error, therefore, is a "mere technical error," and suppression is only appropriate if Williamson suffered prejudice or if the violation was deliberate. *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992) (citing *Johnson*, 660 F.2d at 753); *see also United States v. Ridgway*, 300 F.3d 1153, 1157 (9th Cir. 2002).

2

**[5]** Williamson concedes that there was no prejudice here. "Prejudice" means that the "the search would not have occurred or would not have been so abrasive if law enforcement had followed the Rule." *Martinez-Garcia*, 397 F.3d at 1213; *United States v. Crawford*, 657 F.2d 1041, 1047 (9th Cir. 1981). Williamson does not contend that no search would

have occurred or that the search would have been less abrasive had the government followed Rule 41(d).**⁵**

3

Williamson argues that Agent Nielsen acted with "intentional and deliberate disregard" of Rule 41(d), and suppression is therefore necessary. During the suppression hearing, Agent Nielsen admitted that he "intentionally"—but not "deliberately"—failed to provide a copy of the search warrant to Williamson before beginning the search.

Both parties believe that Agent Nielsen's mistaken understanding of the law cuts in their favor. On the one hand, Williamson argues that Agent Nielsen intended to serve the warrant at the end of the search, meaning that his failure was volitional, and therefore "intentional and deliberate." On the other hand, the government argues that Agent Nielsen intended to satisfy what he mistakenly believed to be the Rule, meaning that the violation was not deliberate, even if his actions were intentional.

[6] Recently, in *Smith*, we concluded that the violation of Rule 41 was neither deliberate nor prejudicial where the agent executing the warrant, much like Agent Nielsen here, testified that "he did not know of an obligation to show the warrant at

---

**⁵**Had Williamson argued that he was prejudiced, the manner in which the agents executed the warrant—which the district court factored into its analysis of whether Rule 41(d) had been violated—would be relevant. In this case, however, there is no question that the search would not have been appreciably different had the agents followed Rule 41(d): Here, the agents introduced themselves, displayed their identification and a copy of the search warrant, discussed the purpose and scope of the search, narrowed their search based on Williamson's feedback, and offered Williamson an opportunity to examine the seized items. This search is clearly distinguishable from the one in *Gantt*, where the suspect was denied access to the searched area, had her request for a copy of the warrant rebuffed, and had no idea what items were seized.

the outset of the search—[the agent] 'never' before had presented a warrant at the time of entry." 424 F.3d at 1007.[6] We concluded in *Smith* that, while the officer did not know of the relevant Rule 41 requirement, his actions were *not* in "intentional and deliberate disregard" of the Rule.

Other cases have equated "deliberate and intentional disregard" with "bad faith." For example, in *Crawford*, 657 F.2d at 1048, we refused to invoke the exclusionary rule without evidence of "bad faith." *See also United States v. Luk*, 859 F.2d 667, 673 (9th Cir. 1988). Along similar lines, in *United States v. Radlick*, 581 F.2d 225, 228-29 (9th Cir. 1978), we concluded that whether there was "intentional and deliberate disregard" turns on whether there was an "intent to flout the Rule." *See also Gantt*, 194 F.3d at 1005 (concluding that the agents acted with intentional and deliberate disregard of the Rule where they showed bad faith).[7]

**[7]** Our cases show, therefore, that where the agent executing the warrant is unaware of the Rule but acts in good faith in executing what he or she believes to be the Rule, he or she has not acted in deliberate disregard of it; thus suppression is

---

[6]In *Smith*, the search warrant was served in 1997, while *Gantt* was decided in 1999. However, *Gantt* did *not* create new law—it merely restated the law. *See United States v. Tekle*, 329 F.3d 1108, 1112 (9th Cir. 2003). Therefore, the fact that the agent in *Smith* was unaware of *Gantt* does not resolve whether his actions were in "intentional and deliberate disregard" of the Rule.

[7]Two other considerations support the government's understanding of "deliberate." First, linguistically, one cannot "deliberately disregard" a Rule of which one is unaware, as Williamson suggests. Second, and more fundamentally, if "deliberate and intentional disregard" includes innocent mistakes, then *any intentional act* (in the volitional sense) justifies suppression. If this were the case, the doctrine of technical errors would be hollow—*all* mistakes would be intentional and deliberate and would require suppression (as long as the underlying action was undertaken volitionally). This would run counter to the concept that suppression is generally not the appropriate remedy for a Rule 41 violation. *See, e.g., Calandra*, 414 U.S. at 348 n.6; *Gantt*, 194 F.3d at 1005.

not appropriate, assuming that the officer's actions result in no prejudice to the defendant and that the error does not rise to the level of a constitutional violation. Williamson argues that refusing to suppress rewards ignorance of the law. However, we do not condone an officer's ignorance of established law. We simply recognize here that a legal error does not merit suppression where the mistake has no material effect on the defendant's rights. *See*, *e.g.*, *Chapman v. California*, 386 U.S. 18 (1967). Here, Agent Nielsen acted in good faith, Williamson suffered no prejudice, and the error was not of a constitutional magnitude. The district court quite properly denied the motion to suppress.

### III

Williamson next argues that the search warrant itself is invalid.[8] First, Williamson contends that the warrant lacked probable cause because the Affidavit supporting it did not specify whether the 19 original pornographic images were legal or illegal images—that is, whether the images fell under 18 U.S.C. § 2256(8)'s valid subsections (A) and (C), rather than under the unconstitutional subsections (B) and (D). *See Free Speech Coalition*, 535 U.S. 234. Second, Williamson contends that, even if there were probable cause to support the search warrant, it was still invalid because it was overly broad and failed to distinguish between prohibited child pornography and constitutionally protected "virtual child pornography." *See id.*

---

[8]A finding of probable cause is reviewed de novo, but findings of fact are reviewed for clear error. *United States v. Vesikuru*, 314 F.3d 1116, 1122 (9th Cir. 2002). The appropriate probable cause standard embodies "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotation marks omitted), and focuses on "common sense conclusions about human behavior," *United States v. Cortez*, 449 U.S. 411, 418 (1981).

A

**[8]** Williamson claims that the Affidavit failed to provide the magistrate with an adequate basis to determine whether the child pornography sought fell within the constitutionally valid portions of 18 U.S.C. § 2256(8). After *Free Speech Coalition*, the possession of "sexually explicit materials" involving "minors" remains illegal. It is only the possession of "child pornography" depicting those who are not minors but appear to be so that is constitutionally protected.

This distinction was dispositive in *United States v. Hay*, 231 F.3d 630, 639 (9th Cir. 2000), where we considered and rejected an analogous overbreadth challenge. Hay had been convicted under § 2256 before we decided *Free Speech Coalition*, but challenged his conviction shortly after our decision in that case. We rejected his challenge, reasoning:

> [T]he jury was specifically instructed that the term "child pornography" means any visual depiction of sexually explicit conduct where "the production" involves the "use of a minor [defined as 'any person under the age of eighteen years'] engaging in sexually explicit conduct" and "such visual depiction is of [a person under the age of eighteen years] engaging in sexually explicit conduct." A production using a child is very different from morphing, and Hay does not suggest how there could be anything unconstitutional about this definition. We see no error, plain or otherwise.

*Id.* (alterations in original). In *Hay*, we considered it determinative that the jury instructions specifically excluded virtual child pornography.

Here, with respect to the 19 images transmitted to Croatia, the Affidavit stated:

> Your affiant's review of the above referenced image files revealed that all 19 photographs contain images depicting *"minors"* engaged in "sexually explicit conduct" as defined in [18 U.S.C. § 2256] . . . . Specifically, these images depicted unclothed *"minors"* . . . engaged in sexual acts . . . [A] majority of them depict *individuals under the age of 18 years* engaging in actual or simulated sexual acts . . . .

(Emphasis added.)

**[9]** The Affidavit states that all 19 photographs are of *"minors"* who are "individuals under the age of 18 years." Therefore, the same limiting language exists in the Affidavit here as was in the jury instruction in *Hay*. By defining the illegal materials as photographs depicting "minors" engaged in "sexually explicit conduct," the Affidavit excludes virtual child pornography—which by definition does not depict minors—and alleviates any constitutional concern by focusing only on materials that remain illegal after *Free Speech Coalition*.[9]

---

[9]Further, there is no hint in the Affidavit that the pictures were virtual child pornography—rather, the Affidavit explicitly states that the search was for actual child pornography. Indeed, Williamson stipulated that the government could show that the pictures were of actual children.

Moreover, even if the Affidavit had failed to restrict the search to materials involving "minors," the warrant would not necessarily lack probable cause. The First Circuit rejected the argument that a warrant lacks probable cause when it fails to distinguish between actual and virtual child pornography. *United States v. Syphers*, 426 F.3d 461 (1st Cir. 2005). *Syphers* reasoned that *Free Speech Coalition* concerned the elements of the crime of possession of child pornography. In contrast, an affidavit supporting a search warrant must *only* establish probable cause to believe that, under a totality of the circumstances, pictures of actual children would be found. *Syphers*, 426 F.3d at 466. The same is true here: even if the Affidavit had not specified that the pictures were of "minors," the information averred would still be sufficient to establish probable cause to believe that actual child pornography would likely be found.

**[10]** Contrary to Williamson's argument, the Supreme Court has specifically rejected the contention that there is a heightened standard for the seizure of materials that might implicate the First Amendment.[10] "[A]n application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally." *New York v. P.J. Video, Inc.*, 475 U.S. 868, 875 (1986). Therefore, no more is required in issuance of a warrant than that the judge has made a "practical, common-sense decision" that there was a "fair probability" that actual child pornography would be found in the suspect's residence. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

**[11]** We are satisfied that the Affidavit focused only on materials that were not constitutionally protected and was sufficient to establish probable cause.

### B

Williamson next claims that the search warrant was overbroad because it did not distinguish between prohibited virtual child pornography and constitutionally protected pornography.

**[12]** Like the Affidavit that supported it, the search warrant

---

[10]There are, however, additional restrictions on the seizure of materials deemed to be obscene. *See Marcus v. Search Warrants*, 367 U.S. 717, 732 (1961) (requiring the magistrate to "focus searchingly on the question of obscenity" in the context of a large-scale seizure that would constitute a prior restraint); *see also New York v. P.J. Video, Inc.*, 475 U.S. 868, 873 (1986). *See also Heller v. New York*, 413 U.S. 483, 494 (1973) (requiring a "prompt postseizure judicial determination of obscenity"). *Marcus* and *Heller* do not apply since the seizure here does not amount to a prior restraint and the materials are flatly illegal, not allegedly obscene. Similarly, *Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636 (1968) (per curiam), applies to materials "presumptively protected by the First Amendment," which is not the case for the actual child pornography at issue here.

specifically limited the seizure to "visual depictions of *minors* engaged in sexually explicit conduct as defined in [18 U.S.C. § 2256]" (emphasis added). Again, § 2256 defined "minors" as "any person under the age of eighteen." The search warrant's Attachment B, which listed the items to be seized, referred to "minors . . . as defined in [§ 2256]" in paragraphs (d), (e), (f), (g), (h), (i), (j), (k), and (l). The search warrant did not authorize the blanket seizure of "child pornography," and therefore was limited to materials that remain illegal after *Free Speech Coalition*. The definition of illegal materials given to the jury in *Hay* is indistinguishable from that used here.[11] The search warrant was not overbroad.

## IV

Williamson finally argues the district court committed three errors in sentencing him.[12] First, he notes a discrepancy between the oral and written sentencing; second, he objects to the use of "expanded relevant conduct," which he argues was not permitted under the 1998 Guidelines; third, he contends that the sentence is unreasonable in any event.[13]

---

[11]In contrast, the Fourth Circuit concluded that a jury instruction that allowed a conviction for possession of visual depictions that "appear[ ] to be[ ] of a minor engaging in sexually explicit conduct," was overbroad. *United States v. Ellyson*, 362 F.3d 522, 530 (4th Cir. 2003). The court reasoned that the instructions were impermissible because they included "appears to be" language, which tracked the unconstitutionally overbroad § 2256(8)(B). *Id.* at 531. There is no such problem here.

[12]A sentence imposed pursuant to the Sentencing Reform Act, post-*Booker*, is reviewed for reasonableness. *Booker*, 543 U.S. at 261-62); *United States v. Ameline*, 409 F.3d 1073, 1085 (9th Cir. 2005) (en banc). We review the interpretation and application of the Guidelines de novo. *United States v. Nielsen*, 371 F.3d 574, 582 (9th Cir. 2004). Factual findings in the sentencing phase are reviewed for clear error. *Id.* at 582.

[13]Williamson also argues that a due process and ex post facto violation exists because he was sentenced retroactively under *Booker*, but commission of the crime and conviction occurred under *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and *Blakely v. Washington*, 542 U.S. 296

Williamson was charged with violating 18 U.S.C. § 2552A(a)(1), and the central Guideline governing the criminal conduct is U.S.S.G. § 2G2.2. The 1998 Guidelines apply in this case.[14] The district court found facts relevant to the sentencing enhancements beyond a reasonable doubt. Though the Sentencing Guidelines are no longer mandatory, we must evaluate the district court's sentencing analysis to determine whether it was proper. See *United States v. Menyweather*, 431 F.3d 692, 696 (9th Cir. 2005) ("[T]o comply with *Booker*'s mandate that district courts 'take [the Guidelines] into account when sentencing,' courts normally must determine and consider the correct Guidelines range." (brackets in original) (quoting *Booker*, 543 U.S. at 264)).

A

Williamson asserts the "clear error and disparity" between the district court's oral recitation of findings and sentencing as compared to its written findings of fact. Williamson does not cite any law, provide any legal theory, or request any particular relief with respect to such alleged error, but merely recites it.

---

(2004). However, *United States v. Dupas*, 419 F.3d 916 (9th Cir. 2005), forecloses this claim. *Dupas* concluded that "[f]air warning . . . is the touch stone of the retroactivity analysis under the Due Process Clause." *Id.* at 921; *see also United States v. Scroggins*, 411 F.3d 572, 576 (5th Cir. 2005) (rejecting the same due process and ex post facto argument).

Here, Williamson could have consulted the U.S. Code at the time he committed his crime and would have seen that the statutory maximum was 15 years; this alone supplies him with all the fair warning necessary under *Dupas*. *See* 18 U.S.C. § 2252A(a)(1). Therefore, Williamson had fair warning of the applicable statutory maximum, and there is no due process or ex post facto violation.

[14]The district court must apply the Guidelines in effect when the defendant is sentenced, unless doing so creates ex post facto issues. *United States v. Warren*, 980 F.2d 1300, 1304 (9th Cir. 1992).

With no argument presented, we decline to address the claim. Federal Rule of Appellate Procedure 28(a)(9)(A) requires that the argument in an appellant's brief contain the "appellant's contentions and the reasons for them." In *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988), we held that "[i]ssues raised in a brief which are not supported by argument are deemed abandoned." In *Leer*, the appellant attempted to raise a due process claim on appeal merely by stating that they were appealing the district court order, but provided no argument for the court to evaluate. *Id.* Here, Williamson does even less. Williamson simply states that there was a discrepancy, but provides no argument, no legal authority, and no request for relief. "We will not manufacture arguments for an appellant" who has failed "to present . . . specific, cogent argument[s] for [the court's] consideration," especially where "a host of other issues are presented for review." *Entm't Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997) (internal quotation marks omitted). Any argument Williamson might have made on this point is waived.

### B

Williamson's next—and more fully-developed—argument is that the district court impermissibly considered "uncharged and adjudicated behavior unrelated to the charge of conviction" to imposing sentence. Though the district court concluded that the 15-year sentence was the only reasonable sentence, "[a]n error in determining the Guideline range, or in understanding the authority to depart from that range, can prevent district courts from properly considering the Guidelines." *Menyweather*, 431 F.3d at 696. Thus, to determine if the sentence was reasonable, we must consider whether the district court properly applied the Guidelines. *Id.*

**[13]** A sentencing judge may consider "uncharged and unadjudicated" conduct for sentencing purposes if it is deemed "relevant conduct." *See* U.S.S.G. § 1B1.3(a)(1), (2).

The Guidelines distinguish between two categories: "relevant conduct" under § 1B1.3(a)(1) includes *only* acts that occurred during the commission of the offense, while the broader category of "expanded relevant conduct" under § 1B1.3(a)(2) includes any conduct that is part of the same scheme or plan as the offense of conviction. The broader category is used "solely with respect to offenses" which require grouping under § 3D1.2(d), unless otherwise specified. U.S.S.G. § 1B1.3(a)(2).

**[14]** Guideline § 3D1.2(d) does *not* list § 2G2.2 as a groupable offense, so the narrower category of relevant conduct *presumptively* applies to the sentencing. Therefore, "*[u]nless otherwise specified*," relevant conduct is limited to "all acts and omissions committed . . . by the [appellant] . . . that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1) (emphasis added); *cf.* U.S.S.G. § 1B1.3(a)(2). Williamson was sentenced under § 2G2.2, "Trafficking in Material Involving the Sexual Exploitation of a Minor . . . Possessing Materials Involving Sexual Exploitation of a Minor with Intent to Traffic." Thus, under the narrower category of "relevant conduct," the district court could only consider the 19 pictures that were sent to Croatia.

Williamson contends that the Guidelines exclude consideration of the possession of images of prepubescent minors as the basis for a two-level enhancement, as well as the pattern of sexual abuse of his granddaughter, as the basis for a five-level increase.[15] Specifically, Williamson urges that reference to the images of prepubescent minors and the sexual abuse of

---

[15]Presumably, though Williamson is not specific, his challenge to the enhancement under subsection (b)(4) extends to the related four-level enhancement under application note 2 as well. Williamson apparently does *not* challenge the four-level enhancement under § 5K2.0, which the district court determined based, in part, on Williamson's possession of "thousands of images depicting minors engaging in sexually explicit conduct," as well as based on "a psychiatric evaluation indicat[ing] that the defendant presents a high risk to the community."

his granddaughter fall into the category of "expanded relevant conduct," prohibited by the 1998 Guidelines.

## 1

**[15]** The district court enhanced Williamson's sentence because "the material involved includes images of prepubescent children warranting a two-level increase under § 2G2(b)(1)." Because the narrower category of relevant conduct applies, however, only the pictures involved in the "commission of the offense"—the transmission of pictures to Croatia—are relevant. Our review of the record and discussion with counsel during oral argument satisfies us that it was the pictures sent to Croatia, not the pictures uncovered during the search, which formed the basis of the enhancement. The Pre-Sentence Report ("PSR") notes that Williamson "posted images to a site on the Internet depicting prepubescent minors engaged in sexually explicit conduct," and the district court similarly concluded that these pictures depicted prepubescent minors. Because the pictures that were sent internationally (i.e., "trafficked in") depicted prepubescent minors, § 1B1.3(a)(1) does not exclude their consideration for enhancement purposes. We are satisfied that the pictures on which the sentence was based were part of the conduct that occurred during the offense of conviction.

## 2

**[16]** As to Williamson's third contention that enhancement based on a pattern of sexual abuse was improper, § 1B1.3 limits relevant conduct to that which occurred during the commission of the offense "[u]nless otherwise specified." Guideline § 2G2.2(b)(4) application note 1 discusses the evidence that should be taken into account with respect to enhancing a sentence under § 2G2.2(b)(4) for a pattern of sexual abuse:

> "Pattern of activity involving the sexual abuse or exploitation of a minor" means any combination of

> two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, *whether or not the abuse or exploitation (A) occurred during the course of the offense* . . . .

U.S.S.G. § 2G2.2, cmt. n. 1 (1998) (emphasis added). This application note "specifie[s]" that expanded relevant conduct may be considered under § 1B1.3(a)(2) for the purposes of enhancing the sentence under § 2G2.2(b)(4).[16]

[17] We therefore join the Eighth and Eleventh Circuits in concluding that U.S.S.G. § 2G2.2(b)(4) application note 1 allows for consideration of expanded relevant conduct.[17] *United States v. Anderton*, 136 F.3d 747, 751 (11th Cir. 1998) (per curiam) ("the clarifying amendment clearly permits an increased offense level for conduct unrelated to the offense of conviction"); *United States v. Ashley*, 342 F.3d 850, 852 (8th Cir. 2003) ("Note 1 makes U.S.S.G. § 2G2.2(b)(4) unambiguous; the enhancement applies 'whether or not the abuse . . .

---

[16]We previously discussed § 2G2.2(b)(4) in *United States v. Kemmish*, 120 F.3d 937, 942 (9th Cir. 1997). In *Kemmish*, the defendant was arrested for trafficking in child pornography. On appeal, the government argued that the defendant's sentence should have been enhanced under (b)(4) because the child pornography at issue demonstrated a pattern of abuse or exploitation of a minor, though there was no evidence that the defendant himself was involved. The court rejected the government's contention and concluded that the enhancement under § 2G2.2(b)(4) was inappropriate where the defendant *merely* trafficked in child pornography, but did not personally participate in the pattern of abuse or exploitation. *Kemmish* required a "showing of a more direct involvement . . . in the sexual abuse or exploitation of minors." 120 F.3d at 942. *Kemmish* did not, therefore, address the question posed here: whether the application note allows the consideration of expanded relevant conduct.

[17]The Sentencing Commission added Application Note 1 to the Guidelines in 1996 after the First and Sixth Circuit Courts of Appeals held that relevant conduct under § 2G2.2(b)(4) must relate to the offense of conviction (as Williamson argues). *See United States v. Surratt*, 87 F.3d 814, 817-19 (6th Cir. 1996); *United States v. Chapman*, 60 F.3d 894, 900-01 (1st Cir. 1995), *superseded by statute as stated in United States v. Woodward*, 277 F.3d 87, 91 (1st Cir. 2002).

occurred during the course of the offense.'" (quoting U.S.S.G. § 2G2.2 cmt. n. 1.)).

**[18]** We are satisfied that U.S.S.G. § 2G2.2(b)(4) falls under the category of "unless otherwise specified," and authorizes the consideration of uncharged conduct. Thus, the five-level enhancement under § 2G2.2(b)(4) was appropriate. It follows, therefore, that the further enhancement under Application Note 2, for seriousness of the § 2G2.2(b)(4) violation, was also appropriate.

## C

Williamson further contends that his sentence was "unreasonable" because a judge rather than a jury decided the facts used to increase it; rather than 15 years, it should have been 37 months.

Williamson's argument is foreclosed by *Booker*, which concluded that the sentencing judge could find additional facts, so long as the judge treated the Guidelines as advisory. 125 S. Ct. at 750 ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."); *see also Ameline*, 409 F.3d at 1077 (noting that, "if a particularly prescient sentencing judge, pre-*Booker*, had made and used the same extra-verdict findings . . . , but made clear that he was treating the Guidelines as advisory rather than binding, no Sixth Amendment violation would have occurred under *Booker*"). It is clear that the judge did not decide any of the relevant facts used to enhance Williamson's sentence under a mandatory Guidelines regime. It follows that Williamson's sentence was not unreasonable under the Sixth Amendment.

## D

**[19]** Williamson finally argues that his sentence was unreasonable under 18 U.S.C. § 3553(a). But, the district court con-

sidered the nature of circumstances of the offense, the need for the sentence imposed given the seriousness of the offense, the kinds of sentences available, and the range of sentences available. The district court found that Williamson abused his own granddaughter while he was in a position of authority over her; created his own child pornography using his granddaughter; accused his son of the sexual abuse he committed against his granddaughter; failed to show any remorse; and collected thousands of images depicting minors engaging in sexually explicit conduct, giving his entire life over to the collection of sexually explicit images. Further, the psychiatric evaluation of Williamson indicated that he presents a continuing high risk to his community. The district court noted that none of these factors was adequately considered under the Guidelines, and concluded that "the maximum sentence is the only reasonable sentence that is reasonable under these facts and serves the purposes of § 3553." Further, similar sentences have been considered reasonable. *See United States v. Wright*, 373 F.3d 935 (9th Cir. 2004) (approving 15- and 20-year sentences under similar facts). We are satisfied that the district court's sentencing decision is reasonable in light of the policies set forth in § 3553(a).

V

For the foregoing reasons, the decision of the district court is AFFIRMED.